[L. A. No. 29621. In Bank. Aug. 5, 1969.]

DOROTHY BILLINGTON, Plaintiff and Appellant, v. INTERINSURANCE EXCHANGE OF SOUTHERN CALIFORNIA, Defendant and Respondent.*

*Defendant's correct name is Interinsurance Exchange of the Automobile Club of Southern California.

732

Bernard A. Leckie for Plaintiff and Appellant.

Edward I. Pollock, Robert E. Cartwright, Theodore A. Horn, Leo M. O'Connor and Leonard Sacks as Amici Curiae on behalf of Plaintiff and Appellant.

Gilbert, Thompson & Kelly and Jean Wunderlich for Defendant and Respondent.

MOSK, J.—Plaintiff was injured in an automobile accident on March 20, 1962, while riding as a guest in the car of Michael James Giesler, who was defendant's insured. She filed an action alleging that Giesler was guilty of wilful misconduct and intoxication, and defendant filed an answer on Giesler's behalf, asserting plaintiff's contributory negligence and assumption of risk as defenses. Giesler failed to appear for his deposition after numerous attempts by defendant to

persuade him to do so, and the trial court granted plaintiff's motion made under section 2034, subdivision (d), of the Code of Civil Procedure, to strike the answer.[1] A default judgment against Giesler was entered in the sum of $51,716.32.

Plaintiff subsequently filed the present action, in which she seeks to recover $10,000 from defendant, the liability limit set forth in the policy. Defendant resisted the action on the ground that the policy contained a requirement for Giesler to cooperate in the defense of the action, that he had failed to do so, and that defendant was prejudiced by his conduct because he "would have had a good and legitimate defense" if he had cooperated.

The trial court found that Giesler had failed to cooperate and that his conduct had resulted in substantial prejudice to defendant. The finding of substantial prejudice was based upon the court's determination that Giesler's conduct prevented defendant from offering any evidence in the prior proceeding in support of the defenses of contributory negligence and assumption of risk and that "without determining the validity" of these defenses they were "bona fide and substantial" and the trier of fact "could have reasonably and properly accepted" them and found them "to be true." Plaintiff appeals from the ensuing judgment in defendant's favor.

The primary question presented is whether a determination that an insurer was substantially prejudiced by its insured's breach of a cooperation clause may be based upon the conclusion that there might have been advanced a valid defense which the finder of fact could reasonably have accepted. In our view, a holding of substantial prejudice cannot be supported upon this tenuous foundation.

Prior to the accident defendant had issued to Giesler an automobile liability policy under the assigned risk plan. (Ins. Code, §§ 11620-11629.5.) By its terms defendant became obligated to pay as damages up to $10,000 for bodily injury sustained by any one person in an accident. Among the conditions set forth in the policy was a requirement that if suit was brought against Giesler he must cooperate with defendant, attend hearings and trials, and assist in the conduct of

---

[1]Section 2034, subdivision (d), provides in part, "If a party . . . willfully fails to appear before the officer who is to take his deposition, after said party or his attorney has been served with a proper notice . . . the court on motion and notice may strike out . . . any pleading of that party, or dismiss the action . . . or enter a judgment by default against that party. . . ."

the case in other respects. It was also provided that no action would lie against defendant unless these terms were satisfied.

## Plaintiff's Action Against Giesler

On November 5, 1962, plaintiff filed an action against Giesler seeking to recover $100,000 in general damages, $4,132.65 in medical expenses, and $655.50 for loss of earnings. As we have seen, the complaint alleged that the proximate cause of plaintiff's injuries was the intoxication and wilful misconduct of Giesler, and the answer set forth the affirmative defenses of contributory negligence and assumption of risk.

Giesler furnished defendant with a statement in June 1962 in which he denied that he was intoxicated on the night of the accident. Defendant took plaintiff's deposition and obtained her answer to interrogatories but was unable to secure Giesler's presence for the purpose of having his deposition taken by plaintiff's counsel. Plaintiff attempted to take Giesler's deposition on at least seven occasions but in spite of the fact that defendant, by registered and unregistered letter, telegrams, telephone calls, and at times a combination of these methods, urged Giesler to attend, he did not appear on any of the designated dates. Defendant's attorneys and an independent investigator employed by defendant spoke to Giesler on the telephone a number of times during this period, explaining the necessity for his attendance at the deposition. Each time Giesler promised he would be present at a future date.

In late 1964 plaintiff made a motion to strike Giesler's answer on the ground that he had wilfully failed to give his deposition. (Code Civ. Proc., § 2034, subd. (d).) After the motion was granted and a default judgment was entered, defendant filed a notice of appeal on behalf of Giesler, but the appeal was not perfected and it was eventually dismissed.

## Plaintiff's Action Against Defendant

Plaintiff then filed the present action as a purported creditor-beneficiary of defendant, seeking to recover the $10,000 which was the liability limit under the policy defendant had issued to Giesler. As we have seen, defendant disclaimed liability on the ground that Giesler had violated the cooperation clause and that defendant was prejudiced by the violation.

The evidence at the trial was as follows: the accident occurred about 1:50 a.m., while Giesler was driving to plaintiff's apartment from a restaurant in Los Angeles and plain-

tiff was riding with a third person in the back seat of the car. Earlier in the evening she had joined Giesler and the third party at the latter's apartment for a birthday celebration. From there they went to several restaurants. During the course of the evening they each consumed a number of alcoholic drinks. As Giesler drove in a westerly direction on Exposition Boulevard, his car crossed into the oncoming traffic lane, struck a parked car, forcing it over the curb into a fence, and then struck another parked vehicle before it came to rest more than 100 feet from the second point of impact. Plaintiff suffered facial injuries in the accident.

The police arrived a few minutes later. According to the police report, Giesler initially denied that he had been operating the car and claimed that a friend had been driving. The report then states that Giesler was "in an obviously drunken condition; breath alcoholic; eyes watery; speech thick; balance unsteady and staggered noticeably while walking. . . . [He] was unable to operate a motor vehicle . . . in a safe and prudent manner." The report also relates that later Giesler offered the officers a bribe "to forget about this," admitted that he had had "quite a few" drinks that evening although he did not know how many, and reiterated his claim that someone else had been driving. Plaintiff told the police that Giesler had been driving and that she did not know whether or not he was drunk. Giesler pleaded guilty in the summer of 1962 to a felony drunk driving charge arising out of the accident.

Plaintiff testified that Giesler did not appear to be sleepy or drowsy on the night of the accident, that she did not feel he was under the influence of intoxicating liquor, that he seemed to be perfectly normal, and that there was nothing unusual about his eyes or the manner in which he spoke. A witness who observed him immediately after the accident also stated there was nothing about him which would lead her to conclude he was intoxicated. The purpose of this line of testimony was apparently to establish that Giesler did not appear to be intoxicated and that, therefore, plaintiff had not assumed the risk of embarking on a journey with him while he was obviously unfit to drive and that she was not guilty of contributory negligence.

Plaintiff also testified that she had consumed only two or three drinks during the course of the evening and that Giesler had imbibed three or four. In the statement Giesler made to the insurance company in June 1962 he claimed that

neither he nor his companions were intoxicated, that they each had five drinks during the course of the evening, and that the accident occurred when an animal ran in front of his car and he swerved to the left.

A number of persons employed in defendant's claims department testified that in their opinion the case could have been successfully defended if it had been brought to trial. An attorney employed by defendant in the first action stated his opinion that a jury would have found that Giesler was intoxicated when the accident occurred and that it would have rejected plaintiff's testimony that she did not realize his condition. The latter conclusion was based upon the facts that she had been with Giesler for a long period of time on the night of the accident and knew that he had been drinking and that the police report stated that Giesler was obviously intoxicated. These findings would lead a jury to conclude, he testified, that plaintiff had assumed the risk of riding in the car with Giesler when he was in a manifestly intoxicated state and that she did not exercise ordinary care for her safety. The attorney also stated that in his opinion Giesler's presence was necessary for a successful defense.

The trial court found that Giesler had wilfully failed to cooperate with defendant and that this lack of cooperation resulted in prejudice to defendant in that it was "precluded . . . from offering any defense on [Giesler's] behalf whatsoever . . . or any evidence in support of the affirmative defenses of contributory negligence and assumption of risk . . . which the court finds, without determining the validity thereof, stated a bona fide and substantial defense which the finder of fact could have reasonably and properly accepted and found to be true." It was also found that defendant was not guilty of bad faith in handling the defense or in negotiating a possible compromise of plaintiff's settlement demands.

Before proceeding to the merits we pause to consider briefly an initial contention of plaintiff that defendant may not rely upon Giesler's violation of the cooperation clause because it was not pleaded as an affirmative defense in the answer. As we have seen, the answer disclaimed liability on the basis of Giesler's refusal to comply with the cooperation clause. Plaintiff does not suggest why such an allegation is insufficient. (See Code Civ. Proc., § 437.) Moreover, this contention is raised for the first time on appeal (*Everly Enterprises, Inc.* v. *Altman* (1960) 54 Cal.2d 761, 765 [8 Cal.Rptr. 455, 356 P.2d 199]) and plaintiff did not object to the intro-

duction of evidence based upon the cooperation clause defense at the trial. Under these circumstances, the claim that the answer was defective lacks merit.

 Unquestionably, there was sufficient evidence to justify the trial court's finding that Giesler had breached the cooperation clause of the policy. However, the court did not apply the proper criterion in determining whether defendant was prejudiced by Giesler's failure to cooperate. In the leading case of *Campbell* v. *Allstate Ins. Co.* (1963) 60 Cal.2d 303 [32 Cal.Rptr. 827, 384 P.2d 155], this court unanimously held that the burden of proving that a breach of the cooperation clause resulted in substantial prejudice is on the insurer. The decision (at p. 307) disapproved *Margellini* v. *Pacific Auto. Ins. Co.* (1939) 33 Cal.App.2d 93 [91 P.2d 136], and a number of other cases which stood for the proposition that prejudice is presumed from an insured's violation of the cooperation clause. We concluded that under the circumstances set forth in *Campbell* the insurer had not met its burden of establishing prejudice.[2]

If an insurer could meet its burden of establishing substantial prejudice from the breach of a cooperation clause by a mere showing that a jury could reasonably and properly have accepted a defense, the holding of *Campbell* would be effectively vitiated since we can conceive of few cases in which an insurer would be unable to maintain that a finding could reasonably have been made in a defendant's favor. Subsequent to our decision in *Campbell* the Wisconsin Supreme Court held that the possibility of prejudice to an insurer from its insured's failure to cooperate is not sufficient and that actual prejudice must be shown. (*Foote* v. *Douglas County* (1966) 29 Wis.2d 602 [139 N.W.2d 628, 631]; see *Stippich* v. *Morrison* (1961) 12 Wis.2d 331 [107 N.W.2d 125, 128].)

 We hold, therefore, that an insurer, in order to establish it was prejudiced by the failure of the insured to cooperate in his defense, must establish at the very least that if the cooperation clause had not been breached there was a substantial likelihood the trier of fact would have found in the insured's favor. A less stringent standard would not be con-

---

[2]Two cases subsequent to *Campbell* applied its rationale in upholding determinations of trial courts regarding the question of prejudice. (*Allstate Ins. Co.* v. *King* (1967) 252 Cal.App.2d 698, 705-711 [60 Cal.Rptr. 892]; *Hanover Ins. Co.* v. *Carroll* (1966) 241 Cal.App.2d 558, 567-571 [50 Cal.Rptr. 704].)

sonant with our holding in *Campbell* that the insurer has the burden of showing it was substantially prejudiced by the insured's failure to cooperate.

In the instant case, however, we cannot hold, as we did in *Campbell*, that the defendant was not prejudiced as a matter of law by the breach of the cooperation clause. There was convincing evidence that Giesler was intoxicated at the time of the accident and that his appearance so indicated. On the other hand, plaintiff and a witness who had observed Giesler immediately after the accident testified that he did not appear to be intoxicated. The trial court could have resolved this conflict by finding that Giesler was intoxicated, that plaintiff knew he was unable to drive safely, and that she showed a wilful and reckless disregard for her own safety by riding with him; i.e., that she assumed the risk of the journey. As a result, the case must be remanded to the trial court with directions to determine whether there was a substantial likelihood that Giesler would have prevailed if the issue of plaintiff's assumption of risk had been tried. On remand, however, the trial court may not find that defendant was prejudiced by its inability to litigate the defense of contributory negligence since we recently held in *Williams* v. *Carr* (1968) 68 Cal.2d 579, 588 [68 Cal.Rptr. 305, 440 P.2d 505], that contributory negligence is not a proper defense in an action under the guest statute.

Plaintiff argues that defendant should be estopped to rely on Giesler's failure to cooperate as a defense because defendant assertedly breached its duty under the policy by refusing to accept settlement proposals made by plaintiff within the policy limits. A few months after the accident plaintiff offered to settle her claim for $4,500, a sum less than her special damages. Thereafter, she offered to accept a settlement of $10,000, the amount of the policy limits. Defendant offered no more than $1,000 at any time. Its attorney testified that this was the estimated cost of a defense and that he felt that if the case had come to trial a verdict in Giesler's favor was probable. It was conceded, however, that if a judgment had been rendered in plaintiff's favor it would have exceeded the amount of the policy limits.

In *Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal. 2d 654 [328 P.2d 198], we held that every contract of insurance contains a covenant of good faith and fair dealing, that the insurer is required to settle a claim against the insured in an appropriate case under such a covenant, and that when ''there is a great risk of a recovery beyond the policy limits so that

the most reasonable manner of disposing of the claim is a settlement which can be made within those limits, a consideration in good faith of the insured's interest requires the insurer to settle the claim.'' (50 Cal.2d at p. 659.)

We have not been cited any authority holding that an insurer may be estopped to rely upon the cooperation clause because of an asserted bad faith failure to accept an offer of settlement.[3] Moreover, the trial court found that defendant was not guilty of bad faith in handling Giesler's defense or in failing to negotiate a compromise settlement, and the contentions urged by plaintiff, while containing arguable merit, do not compel a contrary conclusion.[4]

■ Plaintiff relies upon a statement in *Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 431 [58 Cal.Rptr. 13, 426 P.2d 473], that perhaps an insurer should be liable for any judgment exceeding the policy limits if it refuses an offer of settlement within those limits. We there referred to commentators who urged the theory that an insurer, faced with a settlement offer at or near the policy limits, should not be able to reject it and gamble with the insured's resources to further its own interests; we said that ''the insurer, which may reap the benefits of its determination not to settle, should also suffer the detriments of its decision.'' Aside from the obvious distinctions between the factual situation in *Crisci* and the instant case we would be unwarranted in applying the proposed rule where, as here, the insurer was unable to maintain any defense to the action on behalf of the insured as a result of the latter's refusal to cooperate in his defense.

■ Finally, plaintiff claims that because Giesler was

---

[3]*Critz* v. *Farmers Ins. Group* (1964) 230 Cal.App.2d 788, 801 [41 Cal. Rptr. 401, 12 A.L.R.3d 1142], relied upon by plaintiff, does state that the requirement of cooperation by the policyholder assumes that the insurer has complied in good faith with the provisions of the policy and that an insurer may be estopped to claim breach of a cooperation clause if the failure to cooperate has been induced by its own action. There the insurer had breached its good faith duty to settle and the court determined that although this did not absolve the insured of his obligation under the cooperation clause to appear and testify, it narrowed his duty to cooperate to the extent that he could assign to the plaintiff his cause of action against the insurer for the breach of the latter's duty to settle the action in good faith. Said the court, he ''need not indulge in financial masochism.''

[4]Some of the matters pointed to by plaintiff are that defendant failed to notify Giesler that there had been offers to settle the claim within the policy limits in spite of the fact that its employees had been instructed to notify insured persons of such offers and that the results of defendant's investigations were not communicated to Giesler. (See *Davy* v. *Public National Ins. Co.* (1960) 181 Cal.App.2d 387, 396 [5 Cal.Rptr. 488].)

insured under the assigned risk plan defendant is precluded from raising his violation of the cooperation clause as a defense. This contention is based upon the erroneous premise that assigned risk policies are the equivalent of compulsory insurance. A number of cases have held that if the insured is required by law to obtain insurance, the insurer may not rely upon breach of the cooperation clause as a defense because compulsory insurance statutes and the policies issued as a result thereof are for the protection of the public, not merely for the benefit of the contracting parties.[5] (See e.g., *Royal Indemnity Co.* v. *Olmstead* (9th Cir. 1951) 193 F.2d 451, 453-454; 31 A.L.R.2d 645.)

 The assigned risk plan cannot be equated with compulsory insurance. The purpose of the plan is to assure that persons who would under ordinary circumstances be unqualified to secure liability insurance should be enabled to obtain such policies; this is accomplished by requiring all insurance companies writing liability policies to accept a share of the assigned risk. (*California State Auto. etc. Bureau* v. *Downey* (1950) 96 Cal.App.2d 876, 880-883 [216 P.2d 882].) Al-

[5]Another aspect of plaintiff's contention is that the language of the statutes establishing an assigned risk plan indicates that a policy issued under the plan is to serve as a guarantee that third persons injured by a driver with such a policy would have a fund accessible in the sum of the minimum amount of insurance required by the Financial Responsibility Law. (Veh. Code, § 16000 et seq.) Plaintiff relies on section 11622 of the Insurance Code, which provides that policies issued under the assigned risk plan shall afford coverage of $15,000 for bodily injury or death to each person as a result of one accident, $30,000 for injury or death to all persons as a result of one accident, and $5,000 for property damage as a result of one accident, or coverage "in such minimum amounts as are necessary to provide exemption from the *security* requirements of Section 16023 of the Vehicle Code. . . ." (Italics added.) Section 16023 of the Vehicle Code provides that if a motorist is required to deposit security after an accident it shall be in amounts no higher than $15,000 for injury or death to one person, $30,000 for injury or death to all persons, and $5,000 for property damage, resulting from one accident. Plaintiff insists there would be no good reason for the Legislature to require an exemption from the "security" requirement of Vehicle Code section 16023 when an assigned risk policy is issued unless such a policy serves to guarantee the payment of the amount of any judgment up to the minimum amount of insurance coverage required by law. We can divine no valid basis for such a conclusion. In section 11622 of the Insurance Code the Legislature has merely stated the required provisions of an assigned risk policy in the alternative, i.e., it must be issued in the amounts specified, or in such amounts as are required by section 16023 of the Vehicle Code, which presently contains the same monetary provisions. The fact that section 11622 refers to section 16023 as setting forth "security" requirements affords no support for plaintiff's bare assertion that the Legislature intended to guarantee that defendant would pay her a minimum amount on any judgment obtained against Giesler without regard to defenses defendant may have against Giesler on the policy.

though an insurance company may be compelled to issue a policy to one who is an assigned risk, there is no absolute compulsion upon the driver of a vehicle to obtain such insurance or any insurance as a condition of operating a car. ██ Accordingly, authorities on insurance law indicate an injured person is subject to the defense of the insured's failure to cooperate under an assigned risk policy. (See 7 Appleman, Insurance Law and Practice, § 7297, p. 120.)

██ Plaintiff also relies upon the provisions of the Financial Responsibility Law. ██ That law does not compel a driver to obtain insurance or to prove his financial responsibility as a condition of obtaining an operator's license but it does impose sanctions upon a driver who negligently injures others on the highway and cannot demonstrate his ability to respond in damages. (See *Simmons* v. *Civil Service Emp. Ins. Co.* (1962) 57 Cal.2d 381, 385 [19 Cal.Rptr. 662, 369 P.2d 262].) ██ It is true, however, as plaintiff argues, that the policy underlying the Financial Responsibility Law is to protect those persons who are injured on the highway through no fault of their own. This policy has been alluded to in a number of cases (see e.g., *Interinsurance Exchange* v. *Ohio Cas. Ins. Co.* (1962) 58 Cal.2d 142, 154 [23 Cal.Rptr. 592, 373 P.2d 640]), and its importance is most recently emphasized in *Barrera* v. *State Farm Mut. Auto. Ins. Co.* (1969) *ante*, p. 659 [79 Cal.Rptr. 106, 456 P.2d 674].[6] Our holding here does not conflict with the purpose of the Financial Responsibility Law since, if a court finds that there was a substantial likelihood that the insured would have prevailed had he cooperated in his defense, there is little danger that an innocent plaintiff will be denied recovery by the insurer's reliance upon the cooperation clause.

While other contentions made by plaintiff are without merit and do not require discussion, we take note of amici curiae who urge us to ban reliance upon the violation of the cooperation clause by an insured as a defense against an injured third party who has recovered a judgment against the insured. It is claimed that statutory provisions and cases lend support to this proposal.

[6] *Barrera* holds that an insurer which failed to make a reasonable investigation of insurability within a reasonable period of time from the acceptance of the application and the issuance of an insurance policy is liable to an injured third person who has obtained a judgment against the insured. In the present case the insurer has not been negligent in carrying out its duties and its actions did not, as in *Barrera*, contribute to the presence of a financially irresponsible motorist on the highway.

Amici first assert that the insurer's attempt to disclaim liability because of an insured's breach of a cooperation clause amounts to a cancellation and that a cancellation may not affect accidents which occurred prior thereto. It has been said that a cooperation clause constitutes a condition subsequent or a condition precedent in an insurance policy (*O'Morrow* v. *Borad* (1946) 27 Cal.2d 794, 800 [167 P.2d 483, 163 A.L.R. 894]; *Woodman* v. *Pacific Indem. Co.* (1939) 33 Cal.App.2d 321, 330 [91 P.2d 898]) and no case to our knowledge has viewed the breach of such a clause as a cancellation.[7]

Another contention of amici is that reliance by the insurer on the cooperation clause as a defense violates general statutory provisions that an automobile liability policy shall insure the named insured and permittee drivers against loss from liability for damages arising out of the use of a motor vehicle. (E.g., Veh. Code, §§ 16451, 16452.) Amici suggest that a cooperation clause defense is in derogation of the coverage required by these sections and is therefore against public policy. They cite by way of analogy *Wildman* v. *Government Emp. Ins. Co.* (1957) 48 Cal.2d 31, 39 [307 P.2d 359], in which this court held a statute providing that every policy shall insure the person named therein and any other person driving with his permission was a part of every insurance contract and that the public policy expressed in the provision could not be circumvented by conflicting provisions in the contract.

In the instant case, unlike *Wildman*, the insurance contract is not violative of any specific statutory provision and it is not against the public policy underlying the Financial Responsibility Law, but it is subject to defeasance because of the noncooperation of the insured. Acceptance of amici's argument would result in a prohibition of exceptions or conditions in an automobile liability policy unless specifically authorized by statute. The prevailing rule, on the contrary, is that parties to an insurance policy may contract as they choose if they do not violate law or public policy. (*Linnastruth* v. *Mutual Benefit etc. Assn.* (1943) 22 Cal.2d 216, 218 [137 P.2d 833].) Moreover, section 11580, subdivision (b)(2), of the Insurance Code expressly recognizes an insurer may rely on defenses under the policy since it provides all

---

[7]Section 661 of the Insurance Code, which was enacted after the accident in the present case occurred, provides that the only grounds for cancellation of a policy are nonpayment of premiums or the revocation or suspension of an insured's license.

vehicle liability policies contain a provision that when judgment is secured against an insured the judgment creditor may bring an action against the insurer on the policy "subject to its terms and limitations."

Amici next assert that an insurer may place an injured party in a disadvantageous position if it certifies that the insured is covered by a policy under the Financial Responsibility Law but thereafter disclaims liability under the cooperation clause of the policy. Their theory contemplates the following: the mechanics of establishing the existence of insurance after an accident require a person who is insured to notify the Department of Motor Vehicles of this fact and the name of his insurer. (Veh. Code, § 16000.) Thereafter, the department sends a notice to the insurer regarding the accident and the insurer is required to notify the department within 20 days if it claims that no policy was in effect at the time of the accident. (Veh. Code, § 16060; Cal. Admin. Code, tit. 13, § 100.20.) If the insurer does not notify the department that no insurance was in effect the injured plaintiff is required to rely upon the policy as sole security for his claim. Where, as in the case of a cooperation clause violation, the insurer later disclaims liability, the plaintiff may be harmed in two ways: (1) the insured might have had sufficient property immediately following the accident so that he could have posted security to assure payment of plaintiff's claim but his assets may have diminished by the time the claim of noncooperation is raised, to the point at which he cannot satisfy the judgment; or (2) the plaintiff loses his settlement bargaining powers against defendant since, due to the existence of an insurance policy, the insured is not deprived of his license and may continue to drive.

While this factual potentiality could materialize, any defects in the procedure arise from the Financial Responsibility Law rather than as a result of the defense of noncooperation. The insurer cannot be faulted because it truthfully indicates to the department that the insured has coverage. The failure to cooperate ordinarily does not become evident until long after the 20-day notification period has elapsed. In a law review note which initially advanced the theory proposed here by amici, the author suggests the insurer should only be held responsible for the plaintiff's injury under the circumstances set forth above where it erroneously indicates to the department that there is coverage under the policy and, from facts in its possession within the 20-day period, it should have

known there was no coverage. But where discovery of a defense cannot be made within the 20-day period, as in the case of noncooperation, the author properly concludes that the insurer should not be penalized. (Note (1968) 41 So.Cal. L.Rev. 367, 375-376.)

Furthermore, the requirement that the trial court find prejudice from the breach of a cooperation clause is a complete answer to amici's arguments since such a finding of necessity must be based on a considered conclusion that there was a substantial likelihood the insured would have prevailed absent the breach.[8]

A number of policy considerations in addition to those set forth above are advanced by amici in support of their view that an insurer should not be permitted to rely upon the defense of noncooperation. It is claimed that the risk of noncooperation is no more onerous than the other risks to which the insurer is subjected, that the availability of the defense tempts an insurer to subtly encourage its less desirable risks to "get lost and stay lost" and that it is unfair to an injured plaintiff to compel him to bring two lawsuits to collect his claim and permit the insurer two opportunities to avoid payment. Amici also urge that the issue of substantial prejudice involves surmise and conjecture as to what the result would have been if the insured had cooperated.

Prejudice may be difficult to prove but, as we indicated above, the burden of proof is upon the insurer. (*Campbell* v. *Allstate Ins. Co.* (1963) *supra,* 60 Cal.2d 303, 306.) As to the contention that the insurer may be tempted to encourage its insured not to cooperate, if the trial court finds this to be the fact or finds that the insurer failed to diligently seek its insured's presence a finding that he breached the cooperation clause would not be justified. (See, e.g., *Jensen* v. *Eureka Cas. Co.* (1935) 10 Cal.App.2d 706, 708-709 [52 P.2d 540]; *Pigg* v. *International Indemnity Co.* (1927) 86 Cal.App. 671, 674-675 [261 P. 486].) The "two-suit" point is not persuasive, since under our existing direct action statute an injured party is compelled to bring two lawsuits if he seeks to collect a judgment from the insurer

---

[8]This same answer is applicable to a number of other arguments advanced by amici, such as that an insurer should be precluded from relying upon a cooperation clause because the real victim of the insured's failure to cooperate is the injured plaintiff and that an insurer may be in a better position as a result of the recklessness of its insured than it would have been if he had cooperated.

which issued a liability policy. (Ins. Code, § 11580, subd. (b)(2).)

Upon rehearing the trial court shall determine, in accordance with the principles set forth above, whether defendant was prejudiced by Giesler's violation of the cooperation clause. In making its determination the court shall consider the evidence previously presented and such additional evidence on the question of prejudice as the parties may desire to present.

The judgment is reversed.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.